NACHMAN CORPORATION, Plaintiff,

v.

PENSION BENEFIT GUARANTY CORPORATION (PBGC), Defendant,

and

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Intervenor-Defendants.

No. 76 C 2963.

United States District Court, N. D. Illinois, E. D.

Sept. 15, 1977.

Selwyn Zun, Lawrence R. Levin, Robert W. Gettleman, Joel D. Rubin, D'Ancona, Pflaum, Wyatt & Riskind, Chicago, Ill., for plaintiff.

John A. Fillion, Gen. Counsel, M. Jay Whitman, Anne M. Trebilcock, Asst. Gen. Counsel, Detroit, Mich., Katz & Friedman, Chicago, Ill., for intervenors-defendants.

Christine O. Cook, Steven D. Baderian, Seth H. Tievsky, Washington, D. C., Samuel K. Skinner, U. S. Atty., Chicago, Ill., for defendant PBGC.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

*Cross Motions For Summary Judgment*

Plaintiff Nachman Corporation ("Nachman"), brought this action against the Pension Benefit Guaranty Corporation ("PBGC"), challenging the PBGC's interpretation of certain provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA" or "the Act"), and certain regulations issued by the PBGC based upon its interpretation of the Act.

Nachman seeks a declaratory judgment that it is not liable under § 4062 of the Act, 29 U.S.C. § 1362 for insufficiencies in funding resulting from its December 31, 1975 termination of the Nachman Corporation (Chicago Plant) Agreement and Pension Plan, as amended, ("the Pension Plan"), originally created in 1960 pursuant to a collective bargaining agreement between Nachman and the United Automobile, Air-

craft and Agricultural Implement Workers of America ("the UAW"), and an order enjoining the PBGC from issuing a notice under § 4041(c) of the Act, 29 U.S.C. § 1341(c), to the effect that the PBGC is unable to determine whether the Pension Plan's assets are sufficient to meet the benefits guaranteed under ERISA.

Prior to the motions now pending before the Court, the PBGC moved to dismiss the complaint for failure to state a claim upon which relief can be granted under F.R. Civ.P. 12(b)(6). On March 24, 1977, we issued a memorandum opinion denying the PBGC's motion. On March 28, 1977, we certified the order denying PBGC's motion to dismiss for interlocutory review pursuant to 28 U.S.C. § 1292(b). The Court of Appeals for the Seventh Circuit denied PBGC's motion for leave to appeal in an order entered on April 20, 1977. By Order of June 9, 1977, we granted the UAW's motion to intervene as a defendant.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1349, and 29 U.S.C. § 1302(b). Pending before the Court is Nachman's motion for summary judgment pursuant to F.R.Civ.P. 56(a), along with separate cross-motions for summary judgment of the PBGC and the UAW, pursuant to F.R.Civ.P. 56(b). Neither party claims a genuine issue of a material fact and, accordingly, both plaintiff and defendants seek a judgment in their favor as a matter of law. For the reasons set forth below, plaintiff's motion is granted and defendants' motions are denied.

## I.

In accordance with the collective bargaining agreement between Nachman and UAW, Nachman agreed to establish a pension plan for certain of its hourly rate employees at its Armitage Avenue facility in Chicago. Under the Pension Plan, employee benefits were to become vested after an employee completed 15 years of service and attained age 45. If an employee with vested benefit rights left his employment before reaching age 65, he would have been eligible to receive benefits at age 65 if the plan had sufficient funds available to pay for the benefits. As a result of the Pension Plan's most recent amendments, 90 day advance notice of intent to terminate was required, which notice could be given at any time after August 31, 1975, to be effective contemporaneously with the expiration of the collective bargaining agreement.

Article V, Section 3 of the Pension Plan specifically limited Nachman's general liability for vested benefits pursuant to the plan to "only such benefits as can be provided by the assets of the Fund" created by the Pension Plan, and "[i]n the event of termination of this Plan, there shall be no liability or obligation on the part of the Company to make any further contributions" to supplement the existing funds in the plan.

The complaint alleges that on October 1, 1975, the first date upon which termination notice could be issued in accordance with the collective bargaining agreement, Nachman gave notice that it was terminating the Pension Plan as of December 31, 1975, due to the unprofitable nature of its operations at its Armitage facility.

There appears to be no question that during the term of the plan Nachman complied fully with the bargained-for funding requirements set forth in the Pension Plan, and that but for the newly created benefit provisions of ERISA and the PBGC's interpretations thereunder, Nachman could have properly terminated the Pension Plan in the manner it did with impunity. The controversy herein centers around the nature of the liability imposed by ERISA on employer-sponsors for the funding of "nonforfeitable vested benefits" in plans which were in existence prior to January 1, 1974, and which were terminated prior to January 1, 1976. Plaintiff contends that under the facts of this case Congress never intended to require post-termination funding by an employer-sponsor, since at the time the Pension Plan was terminated the nonforfeitable rights created by ERISA had not yet vested in the individual employees under the Plan. The PBGC maintains, however, that since Title IV of ERISA, which created

the PBGC and plan termination insurance, became effective prior to the termination of the Pension Plan, the PBGC has jurisdiction to issue notice pursuant to § 4041(c) of the Act, 29 U.S.C. § 1341(c) and to proceed in accordance with the provisions of § 4042 of the Act, 29 U.S.C. § 1342.

## II.

█ In enacting ERISA, Congress sought to extend pension benefit protections to the millions of employees and their dependents whose pension funds had terminated without sufficient assets to satisfy the benefit expectations of its subscribers. The Act sets safeguards for the operation of covered plans and establishes standards for the administration of pension plans in an effort to minimize terminations of pension plans and losses to beneficiaries.

Title I of ERISA was enacted for the protection of employee benefit rights, and includes an expedited vesting provision which allows pension benefits to become vested prior to an individual's having reached retirement age. Title II amends the Internal Revenue Code insofar as it relates to retirement plans and includes the requirement of minimum funding of pension plans by employer-sponsors. Title III of the Act creates the Joint Pension Task Force, and sets forth the basic administrative requirements of the Act including the imposition of fiduciary responsibility upon trustees of covered pension plans. Title IV creates the PBGC as a corporate body within the Department of Labor, whose function is to encourage the continuation and maintenance of voluntary private pension plans so as to provide for timely and uninterrupted payment of benefits to participants.

§ 4041(a) of the Act, 29 U.S.C. § 1341(a), requires that prior to the termination of covered pension plans, notice of intent to terminate must first be filed by the employer-sponsor with the PBGC. The PBGC is then required to examine the plan and determine whether the plan's assets are sufficient to pay the guaranteed benefits under the Act. Where the assets are found to be sufficient, the plan administrator is then

authorized to terminate the plan. §§ 4041(b) and (d), 29 U.S.C. §§ 1341(b) and (d). Where, however, the PBGC is unable to determine whether the plan's assets are sufficient to meet the basic benefit obligations, the plan administrator is to be so notified, § 4041(c) of the Act, 29 U.S.C. § 1341(c), a trustee is to be appointed to handle the termination of the plan, and the guaranteed benefits are to be paid out through both the assets of the plan and PBGC funds. §§ 4041(c), 4042(b) of the Act, 29 U.S.C. §§ 1341(c), 1342(b).

The PBGC itself is essentially a government-owned insurance agency charged with supervision over the termination process of covered pension plans, and with guarantying the payment of vested and nonforfeitable benefits to individuals covered by the plans. The financing for the PBGC comes primarily from premium assessments against employer-sponsors of pension plans, which monies are in turn invested by the PBGC in one of the four revolving funds established by § 4005 of the Act, 29 U.S.C. § 1305. Additionally, however, and in an effort to foreclose employer-sponsor reliance upon and abuse of PBGC insurance protections, the Act grants the PBGC a limited right of subrogation against employer-sponsors whose pension plans are inadequately funded at the time of termination. §§ 4062(b) and 4068(a) of the Act, 29 U.S.C. §§ 1362(b) and 1368(a). See, S.Rep. No.93–383, 93rd Cong., 1st Sess. 87 (1973).

## III.

In § 2 of the Act, 29 U.S.C. § 1001, Congress recognized that "many employees with long years of employment [were] losing anticipated retirement benefits owing to the lack of vesting provisions in such plans." In an effort to remedy that situation, Congress adopted detailed vesting provisions in §§ 201–211 of the Act, 29 U.S.C. §§ 1051–1061, which provisions were also made applicable to plans already in existence. In order to allow for appropriate adjustments to those plans which were already in existence, however, Congress postponed the effective date of the vesting pro-

visions for existing plans until "plan years beginning after December 31, 1975."

▮ Thus, in the case of Nachman's Pension Plan, since it was in existence prior to and at the time of the passage of ERISA, and was terminated on December 31, 1975, the vesting provisions of ERISA were never applicable to it.

In setting forth the degree of benefits to be insured and guaranteed by the PBGC, Congress provided in § 4022(a) of the Act, 29 U.S.C. § 1322(a), that: (emphasis added).

the [PBGC] shall guarantee the payment of all nonforfeitable benefits . . . under the terms of a plan . . . .

Under the terms of the Nachman Pension Plan, and in accordance with the law prior to ERISA, it was possible for employee rights under a plan to be vested but subject to forfeiture as a result of underfunding. Accordingly, prior to ERISA the degree of nonforfeitability was directly related to the degree of funding. After ERISA, however, and subject to the effective dates indicated above, benefits became nonforfeitable immediately upon becoming vested; and, in conjunction with the more liberal vesting provisions of ERISA, Congress thereby acted to substantially increase and guarantee the benefits and protections afforded individuals subject to covered plans.

▮ The only definition of "nonforfeitable" found in ERISA appears in § 3(19) of the Act, 29 U.S.C. § 1002(19), which provides: (emphasis added)

The term 'nonforfeitable' when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, *which is unconditional, and*

*which is legally enforceable against the plan.*

Though we recognize that this definition is contained in and limited to Title I of the Act, the PBGC has not presented any persuasive reasons for not assuming a similar usage of the term "nonforfeitable" in Title IV of the Act, § 4022(a), 29 U.S.C. § 1322(a). Rather, as urged by Nachman, the term "nonforfeitable" appears to be used in Title IV just as it is used in Title I. We find support for this conclusion in an axiom of statutory construction, which says: "[a]n earlier specific definition may properly color a subsequent use of the same words without re-definition." *Kent Manufacturing Corp. v. C.I.R.,* 288 F.2d 812, 815 (4th Cir. 1961).

We therefore hold that since the vesting provisions of ERISA were not applicable to Nachman's Pension Plan, the benefits which became vested pursuant to the Pension Plan alone were *not* nonforfeitable, and therefore not subject to guarantee by PBGC under § 4022(a) of the Act, 29 U.S.C. § 1322(a).[1]

▮ PBGC argues, however, that the express language of § 4082(a) of the Act, 29 U.S.C. § 1381(a) which provides for an effective date of September 2, 1974 for the plan termination and insurance program of Title IV, gives the PBGC a right, in the event of insufficient funding upon pension plan termination, to pursue the remedies provided in Title IV even if the benefit had only become "vested" in accordance with the terms of the Pension Plan itself though not "nonforfeitable" as defined in § 3(19) of the Act, 29 U.S.C. § 1002(19). We disagree.

## IV.

We note first that, contrary to the PBGC's assertions, a finding that the Nach-

---

1. The PBGC points out that the second sentence of § 3(19) of the Act, 29 U.S.C. § 1002(19) provides:

   For purposes of this paragraph, a right to an accrued benefit derived from employer contributions shall not be treated as forfeitable merely because the plan contains a provision described in section 203(a)(3) of this title. Relying on I.R.C. Temp.Reg. § 11.411(a)–4(a), promulgated under the vesting provisions of

the Act, the PBGC argues that even if the Title I definition of "nonforfeitable" applies to Title IV, a benefit "conditioned upon a sufficiency of plan assets in the event of a termination or partial termination [is] not considered to be forfeitable." However, the regulation was not applicable to pre-existing plans until after December 31, 1975. I.R.C. Temp.Reg. § 410, p. 15, "Labor Regulations Affecting Internal Revenue Code."

man Pension Plan is not subject to the notice and subrogation provisions of Title IV of ERISA does not automatically void the first 16 months of the Title IV insurance program, for there certainly are many pension plans that began after September 2, 1974 which are subject to Title IV. Rather, we hold that based upon the particular facts of this case—where the Pension Plan was terminated prior to the date upon which benefits could become "vested" under ERISA—the beneficiaries of the Nachman Pension Plan did not have nonforfeitable interests in the plan. If at all, their vested rights were the result of rights given them under the Pension Plan, which specifically provided in Article V, Section 3 that: (emphasis added).

> Benefits provided for herein shall be only such benefits as can be provided by the assets of the Fund. *In the event of termination of this Plan, there shall be no liability or obligation on the part of the Company to make any further contributions* to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid.

Under the Pension Plan, though rights to benefits may have become vested, they were specifically made subject to forfeiture in the event of inadequate funding. This was the plan bargained for by Nachman and UAW, and nothing in the Act appears to require the imposition of a more stringent vesting result.

Despite the language in § 4082(a) of the Act, 29 U.S.C. § 1381(a) which provides for an effective date of September 2, 1974 for Title IV of ERISA, we believe that Congress could very well have intended to extend PBGC insurance coverage to pension plan participants whose rights *had* become fully vested (i. e. nonforfeitable), without imposing the immediate added burden on an employer-sponsor of guarantying full funding of all ERISA required benefits for those participants whose rights had *not* become fully vested, at least until such time as the vesting standards and minimum funding requirements of Titles I and II became effective.

We find nothing in the legislative history of ERISA which evidences a contrary intent. Rather, the legislative history of, and the effective dates in Title IV, reflect Congress' primary desire to provide insurance protection to individual participants as expeditiously and efficiently as possible. See, e. g., 120 Cong.Rec.S. 15749 (daily ed. Aug. 22, 1974) (Remarks of Senator Javits). Where a participant's rights had not become fully vested, as that term is used in the Act, however, the notice and subrogation provisions of Title IV are simply not applicable.

The Court is aware, particularly in light of the affidavit accompanying the motion submitted by the UAW, that this decision may be perceived as affecting the pensions of 135 employees. Affidavit of Robert Kryvicky, UAW exhibit, ¶ 3. It should therefore be reiterated that this decision does not alter the terms of the collective bargaining agreement between Nachman and the UAW. The limitation-of-liability clause, Article V, Section 3 of the Pension Plan, created an expectation both in the participants of the Pension Plan and Nachman.[2] In this instance, on these facts, the advent of ERISA does nothing to disturb the contractual expectation of Nachman or its employees.

The sole issue in this case is Nachman's liability to PBGC, not the PBGC's liability to Nachman's employees. However, as we suggested in our first opinion, that consistent with the expressed Congressional goal of providing immediate insurance protection for participants in pension plans, it is a fair assumption that in cases such as the case at bar, the insurance protection through the PBGC would be available immediately even though the related funding requirements on the employer-sponsor may not yet be in effect. Though Congress cer-

---

2. We do not agree with the UAW's allegation that Article V, Section 3 of the Pension Plan was included in "the fine print" "typical of pre-ERISA defined benefit plans." UAW's Memorandum in Support of Summary Judgment at 8.

tainly desired stricter control and closer supervision over pension plans, it allowed for grace periods to enable employer-sponsors to re-arrange their plans in conformity with the Act.

### V.

We therefore agree with plaintiff that it would be illogical to assume that Congress intended to impose immediate funding requirements on an employer-sponsor at a time when, under the provisions of Titles I and II of ERISA, an employee's rights to those very benefits had not yet vested, and the minimum funding requirements were not yet effective.

Accordingly, plaintiff's motion for summary judgment is granted and defendants' cross-motions for summary judgment are denied. We need not address the constitutional issues raised by the parties in their pleadings.