PENSION BENEFIT GUARANTY
CORPORATION, Plaintiff,

and

United Rubber, Cork, Linoleum and Plastic Workers of America, Solomon, Reddix, and Alex Williams, Plaintiff-Intervenors,

v.

OUIMET CORPORATION, Ouimet Stay & Leather Company, Ouimet Welting Company, Emil R. Ouimet Wareham Trust, Avon Sole Company, Tenn-Ero Corporation and Herbert Kahn, Trustee, Defendants.

Civ. A. Nos. 76–1314–T, 77–2005–T.

United States District Court,
D. Massachusetts.

March 22, 1979.

Paul F. Ware, Jr., Goodwin, Procter & Hoar, Boston, Mass., Judith F. Mazo, Barry Slevin, Pension Benefit Guaranty Corp., Washington, D. C., for Pension Benefit Guaranty Corp.

Sidney Werlin, Friedman & Atherton, Richard E. Mikels, Cohn, Riemer & Pollack, Paul P. Daley, Hale & Dorr, Boston, Mass., for the trustee in bankruptcy.

Richard Maloney, Maloney, Williams & Baer, Boston, Mass., for the Ouimet Group.

Bertram Diamond, Stamford, Conn., Harold B. Roitman, Boston, Mass., for intervenors, URW, Reddix and Williams.

## OPINION

TAURO, District Judge.

At issue here is whether the defendants, several business entities under common control,[1] may be held jointly and severally liable for the termination of an underfunded pension plan by two of their bankrupt affiliates. The plaintiff is the Pension Benefit Guaranty Corporation (PBGC), a creature of Congress born under the provisions of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1302. The prime purpose of that Act is to insure that workers receive the benefits to which they are entitled under private pension plans established for them by their employers. Congress recognized that workers had been unfairly subjected to the loss of expected benefits when underfunded plans terminated. Under ERISA, Congress gave the PBGC the responsibility of administering terminated pension plans to the end that affected workers receive anticipated pension benefits promised them by their employers. It is the PBGC's attempt to administer certain terminated pension plans that underlies this litigation.[2]

## I.

## PROCEDURAL BACKGROUND

PBGC began this action in April, 1976, pursuant to ERISA, to collect the amount for which the defendant Ouimet companies are allegedly liable as a result of the termination of a pension plan by their two affiliates, the Avon Sole Company (Avon) and the Tenn-ERO corporation (Tenn-ERO). Those two corporations had been adjudicated bankrupt on March 22, 1976. On August 20, 1976, the case was referred to the Bankruptcy Judge sitting as a Master pursuant to Fed.R.Civ.P. 53.

In his report, the Bankruptcy Judge concluded that section 1362 of ERISA[3] permitted the PBGC to obtain reimbursement only from the direct employers, Avon and Tenn-ERO. The other members of the controlled group[4] were held to be free from liability arising out of the termination of Avon/Tenn-ERO's pension plan. The Bankruptcy Judge also determined that

---

1. The relationship of the defendant businesses is demonstrated in the diagram below:

2. The PBGC is funded primarily through the payment of insurance premiums by pension plan employers. It also receives funds by way of the reimbursement provisions of sections 4062–64 of the Act, 29 U.S.C. §§ 1362 64. Section 1362, the provision at issue here, requires an employer terminating an underfunded plan to pay the PBGC either the deficit between the plan's guaranteed benefits and the plan's remaining assets or 30% of the employer's remaining net worth, whichever is less.

3. 29 U.S.C. § 1362 provides, in relevant part:
    (a) This section applies to any employer who maintained a plan (other than a multiemployer plan) at the time it was terminated, . . . . .
    (b) Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—
    (1) the excess of—
    (A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over
    (B) the current value of the plan's assets allocable to such benefits on the date of termination, or
    (2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any 'iability under this section.

4. The Ouimet Corporation (Ouimet), Ouimet Stay & Leather Company (Stay) and Ouimet Welting Company (Welting).

Avon and Tenn-ERO were not liable to the PBGC because they had no net worth.[5]

PBGC subsequently appealed the rulings of the Bankruptcy Judge to this court and has also moved to: (1) modify the Master's Report insofar as it finds no liability on the part of the defendant companies; (2) recommit the case to the Master for findings relative to the net worth of the Ouimet controlled group; and (3) enter partial summary judgment for PBGC.

## II.

### FACTUAL BACKGROUND

Avon operated a plant in Massachusetts until March, 1975. In 1973, it formed Tenn-ERO, a wholly owned subsidiary. The companies experienced severe operating losses and on March 22, 1976, were adjudicated bankrupts.

As of the time Avon's Massachusetts plant was closed in 1975, the company was a party to a pension plan agreement, dated May 4, 1959, covering its unionized employees. When Avon shut down its plant, it notified PBGC, as required by ERISA,[6] that it would soon discontinue operations in Massachusetts and would be required to terminate its pension plan.

Through no illegal or improper conduct on Avon's part, its plan was underfunded when terminated. The primary reasons for

the underfunding were that the market value had fallen on certain of the investments comprising plan assets and that the amortization of past underfunded liabilities was not yet complete. See 29 U.S.C. § 1082.

## III.

### THE CONTROLLED GROUP

The ownership picture of the defendant companies, outlined in footnote 1 supra, has significance because of PBGC's position that each of them may be held to make good the deficiencies of the Avon/Tenn-ERO pension plan.[7] PBGC's theory is that, for purposes of section 1362 liability, the term "employer" includes not only the direct employer of the covered employees, but also all trades or businesses under common control with the direct employer.

At a hearing held before this court on March 6, 1978, the parties agreed that Ouimet, Stay and Welting are a controlled group as that term is defined in the IRC. They also agreed that Brockton should not be so included. They dispute, however, whether the Trust may be considered a member of the controlled group.

Defendants seek to have the Trust excluded from the controlled group on the ground that it is not a trade or business within the meaning of section 4001(b) of ERISA, 29 U.S.C. § 1301(b).[8] The Trust, by

---

5. Since an employer's maximum liability under section 1362 cannot exceed 30% of its net worth, see n. 2 supra, a company which has no ascertainable net worth cannot be held liable to the PBGC for purposes of reimbursement.

6. See 29 U.S.C. § 1341.

7. The Bankruptcy Judge found that the relationship of the companies in the Ouimet group made them a controlled group within the meaning of 26 U.S.C. § 1563(a)(3). This section of the Internal Revenue Code (IRC) is indirectly incorporated by reference into ERISA by 29 U.S.C. § 1301(b) in the following manner: Section 1301(b) provides that all regulations promulgated by PBGC relative to controlled group employers shall be consistent with 26 U.S.C. § 414(c). Section 414(c) of the IRC provides that all employees of trades and businesses under common control, whether or not incorporated, are to be treated as employed by a single employer. It states that regulations prescribed

under that subsection shall be based on principles similar to those which apply in section 414(b). That subsection states that all employees of corporations which are members of a controlled group of corporations are to be treated as employed by a single employer. It refers to 26 U.S.C. § 1563(a) for the definition of a controlled group.

8. Section 1301(b) provides:
An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of Title 26. For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single

its terms, is a typical Massachusetts business trust, authorizing the operation of a profit sharing enterprise business. *See Morrissey v. Commissioner,* 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). Indeed, the Trust's tax returns show it to be engaged in the real estate business. One of its corporate affiliates, Stay, has a five year lease on a parcel of improved real estate owned and managed by the Trust.

■ Defendants argue further that section 1301(b) applies only to trades or businesses with employees, and because the Trust has no employees, it may not be deemed an employer. That argument depends on tortured statutory interpretation. The first sentence of section 1301(b) makes it clear that the Trust could be included in the controlled group as an employer although it may have no employees:

> An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer,
>
> . . . .

Emil Ouimet, who owns 100% of the Trust, would be considered his own employer. This court therefore holds that section 1301(b) includes all trades or businesses that are under common control, regardless of whether they have employees.

Given the parties' stipulation that Brockton should be excluded, and the fact that

Stay owns only 50% of that company,[9] this court finds that the Trust, Stay, Welting, Ouimet and Avon/Tenn-ERO are all members of the same controlled group of businesses.

## IV.

## CONTROLLED GROUP LIABILITY UNDER ERISA

■ The issue of controlled group liability for termination of underfunded pension plans is one of first impression. Analysis of the statute and review of the legislative history[10] leads this court to conclude that when one member of a controlled group terminates an underfunded pension plan, the entire group may be held liable by the PBGC for purposes of reimbursement under section 1362 of ERISA.

### A) *The Statute*

■ As the governmental agency in charge of administering the statutory plan of ERISA, the PBGC has interpreted section 1362 as imposing liability on all trades and businesses under common control when an employer within the group terminates an underfunded plan. That determination is subject to challenge and judicial review. 29 U.S.C. § 1303(f); 5 U.S.C. §§ 701, 702.[11] A

---

employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

9. 26 U.S.C. § 1563(a) provides that the common parent must hold at least 80% of the voting stock of all the sibling subsidiaries for those subsidiaries to qualify as members of a controlled group.

10. Prior to examining legislative history, it is appropriate to first determine if the statutory language is clear and unambiguous. If it is, then there is no need to examine extrinsic sources, such as legislative history, to aid in statutory construction. *Preterm Inc. v. Dukakis,* 591 F.2d 121, 128, 135 136 (1st Cir. 1979).

11. Section 4003(f) of the Act, 29 U.S.C. § 1303(f), provides:

Any participant, beneficiary, plan administrator, or employee adversely affected by any action of the corporation, or by a receiver or

trustee appointed by the corporation, with respect to a plan in which such participant, beneficiary, plan administrator or employer has an interest, may bring an action against the corporation, receiver, or trustee in the appropriate court. For purposes of this subsection the term "appropriate court" means the United States district court before which proceedings under sections 1341 or 1342 of this title are being conducted, or if no such proceedings are being conducted the United States district court for the district in which the plan has its principal office, or the United States district court for the District of Columbia. The district courts of the United States have jurisdiction of actions brought under this subsection without regard to the amount in controversy.

The second line of the above quoted section contains a typographical error. The section provides that "any participant, beneficiary, plan administrator or *employee*" may bring suit *in federal court* against the PBGC, if adversely affected by a determination by that

reviewing court must be guided by the construction given a statute by the agency charged with its execution, unless there are compelling indications that it is wrong. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 121, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Here there are no such indications. Indeed, strong support for the agency's interpretation can be found on the face of the statute itself.

The second sentence of 29 U.S.C. § 1301(b) states:

> *For purposes of this subchapter,* under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a *single employer* and all such trades and businesses as a *single employer* (emphasis added).[12]

The provisions of section 1301 are contained in the same subchapter as are those of section 1362, the section imposing liability for reimbursement upon an employer who maintains an underfunded plan at the time of termination. The PBGC argues that section 1301(b) defines "employer" as that term is used in section 1362. Under this theory, the entire control group would be an employer for purposes of section 1362 liability, regardless of whether each member of the group actually contributed to the pension plan. Thus, all members of the controlled group would be potentially liable, jointly and severally, should an affiliate terminate an underfunded plan.

Defendants urge contrary interpretations of sections 1301(b) and 1362.[13] They start by noting that, under section 1362, an employer must "maintain" a plan in order to be held liable. Maintaining a plan is viewed by defendants as being synonymous with contributing to a plan. Defendants conclude, therefore, that because members of the controlled group in this case did not contribute to the terminated plan, they cannot be held liable under section 1362.

This argument hinges upon defendants' contention that section 1301(b) is not a definition of "employer" for the purposes of section 1362, but was merely intended to supplement a provision in section 1301(a). Defendants' theory is based upon the following rationale. Section 1301(a)(3) of ERISA provides that a "multi-employer plan" means a "multi-employer plan" as defined in section 414(f) of the IRC. That IRC provision defines a multi-employer plan as one to which more than a single employer is required to contribute.[14] A significant "special rule" in that section provides, however, that all corporations which are members of a controlled group of corporations shall be deemed to be one employer. 26 U.S.C. § 414(f)(2)(B). Defendants argue that the purpose of section 1301(b) is to modify section 1301(a) by extending the "special rule" enunciated in section 414(f)(2)(B), to the end that all members of a controlled group, whether or not incorporated, are deemed to be one employer.

Under defendants' theory, therefore, section 1301(b) does not abrogate the section 1362 requirement that a member of a common controlled group must "maintain" a plan in order to be held liable. The controlled group defendants in this case did not contribute to the Avon plan. They argue, therefore, that they did not "maintain" that

---

agency. The word "employee" should read "employer."

Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702, grants the right of judicial review to anyone adversely affected or aggrieved by agency action unless another statute expressly or impliedly forbids the relief sought. The PBGC is clearly a governmental agency within the meaning of that section. *See* 5 U.S.C. § 701(b)(1).

**12.** The regulations promulgated by PBGC pursuant to the authority vested in the agency under section 1301(b) virtually echo the wording of the statute. *See* 29 C.F.R. §§ 2612.1–.3.

**13.** The substance of defendants' first argument was advanced in a recent law review article. Note, *Termination Liability Under Title IV of ERISA: Impact on Companies Under Common Control,* 27 Case W.Res.L.Rev. 945 (1977).

**14.** Under certain provisions of ERISA, participants in multi-employer plans are treated differently from single employers who maintain plans. *See* note 20 *infra.*

plan and so have no section 1362 termination liability.

Defendants' interpretations of sections 1301(b) and 1362 fall short for three reasons. First, section 1301, in both the codified and uncodified versions, is labelled as a definitional section. It is difficult to accept the theory that Congress fleshed out the definitions contained in section 1301(a), by adding a separate subsection, 1301(b), rather than simply adding necessary language to section 1301(a).

Second, the definition at issue in 1301(b) is prefaced by the language *"For purposes of this subchapter. . . ."* (emphasis added). This clear, unequivocal explanatory phrase supports PBGC's contention that the definitions of section 1301(b) were intended to apply to the entire subchapter, and not merely as a supplement to a definition in section 1301(a). Defendants read "[f]or the purposes of this subchapter" to mean "[f]or the purposes of this section." In doing so, they overindulge themselves with poetic license.

Finally, it is by no means apparent that the word "maintain" means only "contribute." Regrettably, "maintain" is not defined in the statute. Defendants, however, rely upon an earlier version of section 1362, proposed by the House of Representatives, in support of the argument that the terms "maintain" and "contribute" were intended to be interchangeable.

> SEC. 414 (a) Subject to subsection (e), where the employer or employers *contributing* to the terminating plan or who terminated the plan are not insolvent . . . such employer or employers (or any successor in interest to such employer or employers) shall be liable to reimburse the Corporation [PBGC] for any insurance benefits paid by the Corporation
> . . . . .

H.R. 2, 93d Cong., 2d Sess. § 414(a), 120 Cong.Rec. 4733 (1974) (emphasis added).[15]

Actually, that bit of legislative history cuts the other way. The fact that Congress expressly substituted the word "maintain" for the word "contributing" in the final draft of section 1362 serves to undermine defendants' claim that the two terms are synonymous. It is reasonable to infer that the substitution was substantive rather than merely cosmetic. This court interprets the substitution as being a recognition by Congress that it would be inconsistent to impose liability on a controlled group under section 1301, while at the same time limiting liability under section 1362 to those who actually contribute to a pension plan.[16]

Another argument advanced by defendants is that to incorporate by reference the definition in section 1301(b) into section 1362(a) would render superfluous subsection (d) of 1362. The latter subsection extends liability to successor corporations when the direct employer has ceased to exist by virtue of a reorganization, merger, consolidation or liquidation into a parent corporation. Under the view taken by defendants, this subsection is unnecessary if the term "employer," as used in section 1362(b), already includes both a subsidiary and its parent. Defendants' argument ignores, however, the fact that the term "parent" is not defined directly in ERISA. Rather, section 1563(a) of the Internal Revenue Code, which is indirectly referenced in section

---

**15.** *Cited in* Note, *Termination Liability Under ERISA, supra* n. 13 at 957.

**16.** Defendants also argue that PBGC misconstrues the plain meaning of section 1301(b) by its reading that all trades or businesses under common control shall be treated as a single employer. This construction, according to defendants, fails to take into account the importance of the word "such" in the second sentence of that section. Under defendants' statutory analysis, the word "such" indicates that only "when employees of trades or businesses under common control are to be treated as employed by a single employer, then, and *for that purpose only,* shall the trades or businesses be treated as a single employer." Joint Memorandum of Law of Trustee in Bankruptcy and Defendants at 21. It is defendants' construction, and not plaintiff's, which strains the plain meaning of the statute. The term "such trades and businesses" clearly refers to the section's prior language "trades and businesses (whether or not incorporated) which are under common control."

1301(b) of ERISA,[17] requires that a parent own at least 80% of the voting stock of a corporation for that combination to qualify as being controlled. Because section 1301(b) and section 1362(b) impose liability only upon controlled groups, and not parents, a parent cannot qualify as a single employer of a controlled group under sections 1301(b) and 1362(b) unless it owns at least 80% of its subsidiary's stock. Other Treasury regulations, however, specifically define "parent" as an entity which owns as little as 50% of the subsidiary's stock. *See, e. g.,* Treas.Reg. 1.351–1(c)(4). Thus, section 1362(d)(2) does have independent significance in that it would trigger termination liability if a parent owned less than 80% of a subsidiary's stock, and the other requirements of that subsection were satisfied. The defendants, therefore, are incorrect in their contention that the PBGC's interpretation of Title IV would deprive section 1362(d)(2) of any substantial meaning.

A further argument advanced by defendants is that PBGC's interpretation of section 1301(b) is incompatible with section 1107(d)(7) of ERISA.[18] That section limits the percentage of employee pension funds that may be invested in the securities or real property of employer or employer-affiliates. The term employer-affiliate is defined as,

> a member of any controlled group of corporations . . . of which the employer who maintains the plan is a member. 29 U.S.C. § 1107(d)(7).

This definition, however, does not conflict with the PBGC's view that the term "employer," as used in section 1362, includes controlled group affiliates of the direct employer. Section 1301(b) explicitly defines the term "employer" for the purposes of Title IV of the Act, which includes section 1362. Section 1107 is not contained in Title IV. A facially inconsistent definition of "employer" or "employer affiliate" contained in another Title of ERISA has little relevance to the provisions of Title IV

which contains its own definitions of those terms.

Defendants assert that it would be unjust to hold them liable for a terminated plan to which they do not individually contribute because the Internal Revenue Code does not permit anyone but the direct employer to take deductions for contributions made to a pension plan.

Section 404(a) of the IRC, provides that, subject to certain limitations, contributions paid by an employer to an employee pension plan are deductible. Subsection (g) of 404 states that,

> For purposes of this section any amount paid by an employer under section 4062 . . . or 4064, [29 U.S.C. §§ 1362, 1364] of the Employee Retirement Income Security Act of 1974 shall be treated as a contribution to which this section applies by such employer to or under a stock bonus, pension, profit-sharing, or annuity plan.

Although this subsection clearly covers termination liability payments under ERISA, defendants assert that this IRC provision does not allow an affiliated employer to deduct contributions made to a pension plan covering the employees of another member of a controlled group. In support of that interpretation they point to Revenue Ruling 69–35, 1969 1 C.B. 117, 118, which states:

> [A]mounts contributed under this plan by the corporation that is not the employer of those benefiting from the contribution are not deductible under section 404 of the Code unless they constitute 'make-up' contributions within the purview of section 404(a)(3)(B) and then only to the extent therein provided.

This ruling, however, was handed down in 1969, five years prior to the passage of ERISA, and clearly reflects the concern of the Treasury Department that affiliated corporations might vary annual contributions to a pension plan solely to maximize

---

**17.** *See* n. 7 *supra.*

**18.** *See* Note, *Termination Liability Under ERISA, supra* n. 13 at 960.

favorable tax consequences. Prior to ERISA, therefore, the Treasury Department did not allow affiliates to make tax deductible contributions unless they qualified as employers under the relevant provisions of the IRC.

With the enactment of ERISA in 1974, however, the Treasury Department modified its interpretation of section 404 of the IRC. In a letter to the PBGC, the Treasury Department has stated that reimbursement payments required to be made to the PBGC by an affiliate that is considered an employer under sections 1362 or 1364 by application of section 1301(b), may be deducted pursuant to section 404(g) of the Code. The letter notes that section 404(g) is limited by its literal terms to payments made to the PBGC. It goes on to state that the Internal Revenue Service agrees with the Treasury Department's interpretation of section 404(g). Thus, under the view taken by three government entities, the PBGC, the Treasury Department, and the Internal Revenue Service, payments made by a controlled group affiliate to the PBGC in response to ERISA termination liability are tax deductible. The IRC, therefore, recognizes the potential burden of imposing nondeductible termination liability upon a member of a controlled group, and makes provision to ease that burden.[19]

19. This court's conclusion with respect to PBGC's right to proceed against all affiliates of a controlled group does not serve to disadvantage the creditors of the bankrupts, Avon and Tenn-ERO. PBGC may assert a claim for up to thirty percent of the net worth of the entire controlled group. By applying the net worth of the entire controlled group, the bankruptcy estate will probably be exhausted, and the unsecured general creditors will receive little or no dividend. This result, though painful to creditors, might occur even if the bankrupts were not included in the controlled group. PBGC's termination liability claims have priority over other creditors, and are to be treated "in the same manner as a tax due and owing to the United States for purposes of the Bankruptcy Act . . . ." 29 U.S.C. § 1368(c)(2). Under the Bankruptcy Act, 11 U.S.C. § 104, a tax claim owed to the United States is a priority debt, payable "in advance of the payment of dividends to creditors . . . ." The recent revision of the Bankruptcy Act also gives priority to a tax claim. See 11 U.S.C. § 507(a)(6) (1979) (effective October 1, 1979).

### B) *Legislative History*

Although this court finds that the statutory language of ERISA is relatively clear and unambiguous, a review of the legislative history in this case only reinforces the court's conclusion. ERISA imposes termination liability on all affiliates of a controlled group. Congressional intent is expressed clearly in the Report of the Conference Committee:

> In determining the employer who may be liable for the insurance coverage losses of the corporation [PBGC], all trades or businesses (whether or not incorporated) under common control are to be treated as a single employer.

H.Conf.Rep.No.93-1280, 93d Cong., 2d Sess. 376 (1974), *reprinted in* 1974 U.S.Cong.Code & Admin.News pp. 4639, 5155.

The conferees again emphasized the controlled group concept when they discussed the termination liability provisions of 29 U.S.C. § 1364. Under section 1364, termination liability was extended to multi-employer plans, with the controlled group treated as a single employer for the purposes of determining the liability of each individual employer.[20] As the Report noted:

> In this regard, it should be noted that the affiliated employer rules are to apply in

The practical consequence here, therefore, is that even if the PBGC were not permitted to assert a claim against the bankrupts for up to 30% of the controlled group's net worth, it could, nonetheless, assert a priority lien in the bankruptcy court against the bankrupts and probably submerge any claims of general creditors.

20. Under section 1364, the PBGC is required to determine, in a manner consistent with section 1362, termination liability for multiple employers maintaining a plan. There are, however, several special rules for the determination of section 1364 liability. First, the amount of termination liability allocable to each individual employer is proportionate to the amount that the employer was required to contribute to the plan over the preceding five years. Second, the limitation of employer liability in section 1362(b)(2) (30% of the employer's net worth) is applied to each employer separately under section 1364. 29 U.S.C. § 1364(b).

As noted above, section 1362 is the appropriate termination liability provision when the

this area. That is, if one member of an affiliated group has employer liability, then that liability is to extend to the entire affiliated group. Also, the 30-per-cent-of-net-assets limit is to apply with respect to the net assets of the entire group.

H.Conf.Rep.No.93–1280 at 380, 1974 U.S. Cong.Code & Admin.News at 5159. There is nothing in the Committee Report that lends support to defendants' contention that a controlled group employer must "contribute" to a plan in order for termination liability to attach. To the contrary, the Report demonstrates an intention to extend liability unconditionally to the entire affiliated group.

Defendants counter with the argument that because none of the early House and Senate bills mentioned the controlled group liability theory, the Conference Committee violated a congressional rule by considering and including in a report "matter not committed to [it] by either House." 2 U.S.C. § 190c. 2 U.S.C. § 190c permits the Conference Committee to make "germane modification of subjects in disagreement." One of the matters assigned to the Committee for mediation was a dispute between the two legislative bodies regarding the scope of employer liability. The House bill made an employer liable for 50% of its net worth. The Senate wanted a liability provision for only 30%. The Conference Committee adopted the Senate version and went on to determine that an employer's net worth included the assets of all the companies in a controlled group. See H.Conf.Rep.No.93–1280 at 376, U.S.Cong.Code & Admin.News at 5155. Such a determination was within the scope of matters assigned to the Committee for resolution.

This court holds, therefore, that section 1301(b) defines the word "employer" for the purposes of determining section 1362 liability. Thus, the PBGC may impose termination liability, jointly and severally, on each member of a controlled group, whether or not such member contributed to the terminated pension plan.

## V.

## CONSTITUTIONAL ISSUES

Prior to ERISA, no federal law required pension plans to be fully funded. Defendants argue that imposing retrospective liability under ERISA on employers who established and maintained pension plans prior to its passage violated their Due Process rights under the Fifth Amendment.

It is well established that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). *See also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (Brennan, J., dissenting). In determining the constitutionality of a statute with retrospective effect, a court must consider the nature and strength of the public interest served by the legislation. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv.L.Rev. 692, 697 (1960). In *Turner Elkhorn* the Supreme Court upheld mining safety legislation imposing liability on employers for disabilities incurred by employees whose employment had terminated prior to the date of the enactment of the statute.[21] Finding the statute to be remedi-

---

plan is maintained entirely within the controlled group. Section 1364 would be applicable when the controlled group maintained a plan in conjunction with employers outside the group. For the purposes of determining liability in a multiemployer plan, however, section 1301(b) requires that the controlled group be treated as a single employer.

The failure of Congress to apportion liability among members of a controlled group may be attributed either to legislative oversight or to a

determination that such apportionment is better left as a business decision.

21. Unlike the legislation upheld in *Turner Elkhorn*, ERISA is not wholly retrospective in its operation. The debt to the government arises only if an employer, like defendants, decides to terminate its insufficiently funded plan after the enactment date of the Act.

al in nature, the Court sustained it on the ground that it was a rational measure which transferred the consequences of employment from the injured employee to the employer who had profited from his labor. 428 U.S. at 18, 96 S.Ct. 2882.

The Court in *Turner Elkhorn* distinguished *Railroad Retirement Board v. Alton R. R. Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), on which defendants rely. The *Alton* Court had invalidated as arbitrary a statute requiring employers to finance pensions for former employees of the railroads. The Court there found that such a requirement bore no rational relationship to the Act's underlying purpose of encouraging early retirement, but served only to supplement the salaries of former employees who had already retired.

■ It is questionable, in any event, whether *Alton* retains vitality in light of the Court's recent approach to substantive due process analysis.[22] Remedial legislation is no longer subject to strict scrutiny. Plaintiffs need not demonstrate a compelling public interest to justify the change in employer responsibility imposed by ERISA.

The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.

*Nebbia v. New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 510–511, 78 L.Ed. 940 (1934).

■ The Due Process Clause clearly places greater limitations upon Congress'

power to legislate retrospectively rather than prospectively. Congressional acts, however, are presumed constitutional. The party challenging them has the burden of establishing that Congress acted in an arbitrary and irrational manner. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 15, 96 S.Ct. 2882. Defendants here have failed to demonstrate that application of the controlled group liability concept would be arbitrary or unreasonable. ERISA was enacted to remedy a serious social problem, the loss and frustration experienced by employees deprived of vested benefits as a result of a pension plan termination. *See* S.Rep.No.93–383, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Cong.Code & Admin. News at 4902. *Cf. Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4 (1st Cir. 1978).

One purpose of ERISA is to supplement and enforce federal labor law by preventing employers from promising more than they can deliver by way of benefits when negotiating collective bargaining agreements. The employer liability provisions of Title IV directly serve the primary goal of the pension reform effort, the voluntary continuation and maintenance of private pension plans. Application of the controlled group liability theory fosters that purpose by preventing employers from using corporate segmentation as a shield from termination liability.[23] The statute reflects Congress' judgment that, without controlled group liability, businesses could juggle their activities to eviscerate the termination liability provisions of ERISA. Such prophylactic legislation is valid when applied indiscriminately on an across-the-board basis.

[A] remedial provision [may require] some individuals to submit to regulation who do not participate in the conduct the legislation was intended to deter or control. [I]n defining a class subject to regulation, "[t]he inclusion of a reasonable

---

**22.** *See, e. g., Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). *See also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 19, 96 S.Ct. 2882.

**23.** The contention that Congress has no power to achieve statutory objectives by disregarding

corporate form is a notion that has long been put to rest. *See, e. g., Corn Products Refining Co. v. Benson*, 232 F.2d 554, 565 (2d Cir. 1956); *Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234, 237–38 (2d Cir.), *cert. denied*, 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459 (1935).

margin, to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity." Nothing else will meet the demands of our complex economic system.

*Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 374, 93 S.Ct. 1652, 1663, 36 L.Ed.2d 318 (1973) (citations omitted).

The Supreme Court's decision in *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), does not undercut the PBGC's contention that the employer liability concepts of ERISA meet due process requirements. In *Allied,* the Court examined the constitutionality of a pre-ERISA Minnesota statute that imposed a charge on pension plans not funded sufficiently to cover employees who had worked at least ten years. The Minnesota Act was triggered if an employer either terminated a pension plan or closed a Minnesota office. The Court found the Minnesota statute impaired existing employer-employee obligations and, therefore, was unconstitutional under the provisions of the contract clause.[24] *Allied* is at least facially distinguishable, because ERISA is a federal law not subject to the strictures of the contract clause. In any event, the challenged provisions of ERISA meet the substantive tests imposed by *Allied.*

" 'Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justi-

fying its adoption.' " 438 U.S. at 244, 98 S.Ct. at 2722, *quoting United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The first inquiry under *Allied* is whether the challenged statute has substantially impaired a contractual obligation.

Here, the provisions of the Avon pension plan gave the company the right to "amend, modify, suspend or terminate the Plan" and limited the benefits payable upon termination of the plan to "the assets then remaining in the Trust Fund." Public policy requires that pension plans be construed to avoid the forfeiture of rights earned by an employee through years of service.[25] Given that policy, this court holds that the imposition of termination liability for vested benefits in this case would not substantially impair the provisions of the Avon plan, certainly not to the degree that impairment was present in *Allied.* There, Minnesota law imposed employer liability to cover full pension benefits, whether or not vested, for all ten year employees. By contrast, ERISA imposes liability only for those benefits that have vested in accordance with the terms of a plan.[26]

The difference in contractual impairment between section 1362 of ERISA and the Minnesota statute is a significant one. The First Circuit has recently stated its support for the position that the promise of a pension constitutes an offer which, upon performance of the required services by the

---

**24.** That clause, in relevant part, provides:
"No State shall . . . pass any . . . Law impairing the Obligation of Contracts, . . . ." U.S.Const. art. 1, § 10.

**25.** *See Hoefel v. Atlas Tack Corp.,* 581 F.2d at 6.

**26.** Under section 1362, an employer is liable only for those benefits that are guaranteed under Title IV. 29 U.S.C. § 1362(a) states that only "nonforfeitable" benefits are guaranteed. It is clear that a benefit is only nonforfeitable when an employee has complied with all of the conditions required by him or her under the terms of a plan. Once that happens, the employee has a vested interest in the plan. The terms "nonforfeitable" and "vest" are, therefore, complementary. *See Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947, 955 (7th Cir. 1979). *See also* the PBGC defini-

tion of "nonforfeitable" for Title IV purposes in 29 C.F.R. § 2605.6(a) (1978). The fact that a pension plan contains a clause relieving an employer from liability should the plan terminate does not mean that the benefits of the plan are forfeitable. *Nachman, supra* at 957, *rev'g,* 436 F.Supp. 1334 (N.D.Ill.1977); *In re Williamsport Milk Products Co., Inc.,* —— F.Supp. —— (M.D. Pa.1978). *But see A–T–O, Inc. v. Pension Benefit Guaranty Corporation,* 456 F.Supp. 545 (N.D.Ohio 1978). After defendants attempted to argue that the benefits of the Avon plan were, under the *Nachman* district court opinion, forfeitable and thus not guaranteeable by the PBGC, this court permitted the union representing beneficiaries of the Avon plan, as well as several beneficiaries themselves, to intervene as plaintiffs on November 17, 1978.

employee, becomes a binding obligation. *Hoefel v. Atlas Tack Corp.*, 581 F.2d at 4.[27] *Cf. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Atlas Tack Corp.*, 590 F.2d 384 at 386 (1st Cir. 1979). Thus, the vesting of benefits becomes a significant event that prevents the employer from revoking the offer. Other courts have also noted that the vesting of benefits changes a revocable offer into a binding obligation, and have refused to enforce disclaimer language similar to that in the Avon plan to deprive employees of vested benefits. *See, e. g., Cantor v. Berkshire Life Insurance Co.*, 171 Ohio St. 405, 171 N.E.2d 518, 522 (1960).

Given this view of the law, it seems dubious that the imposition of termination liability for vested benefits would undermine any reliance interest that the defendants may have had in the disclaimer language of the Avon plan. The Minnesota statute in *Allied*, however, went much farther than ERISA in disrupting settled contractual expectations. As noted above, the statute imposed liability for benefits that had not vested under the terms of a plan. In essence, this meant that the employer was

held to his promise before the consideration required by the offer had been rendered. The effect on reliance interests was significant. As the Supreme Court noted:

> The company . . . had no reason to anticipate that its employees' pension rights could become vested except in accordance with the terms of the plan. It relied heavily, and reasonably, on this legitimate contractual expectation in calculating its annual contributions to the pension fund.

438 U.S. at 245 - 246, 98 S.Ct. at 2723.[28]

The negligible infringement of employer reliance interests distinguishes ERISA from the Minnesota statute at issue in *Allied*. It is appropriate, however, to note other differences between the two statutes. First, employer liability could be triggered under Minnesota law solely by a company closing its Minnesota office. The closing of an office was, in fact, the basis of liability in *Allied*. The statutory scheme of ERISA, however, bears a more substantial relation to the problem of termination liability. Under its terms, employer liability is triggered only by formal termination of an underfunded plan.[29] Second, under the

27. In *Hoefel,* the First Circuit held that a clause in a pension plan which gave the employer the right to discontinue the plan was not effective in depriving employees of vested pension rights. The court determined that the subject employees reasonably believed they would be entitled to a lifetime pension upon retirement, provided they had served the company for a specified number of years. *Hoefel* involved facts not found here, including employer misrepresentations, but is instructive on this issue particularly in its discussion of *Boase v. Lee Rubber & Tire Corp.*, 437 F.2d 527 (3d Cir. 1970). In *Boase,* the Third Circuit held that where an employer, in "clear and unambiguous" language reserves the right to terminate a pension plan, it can do so even in a manner which deprives retired employees of earned pension benefits. The First Circuit in *Hoefel* stated that it would decline to follow *Boase* in light of the public policy which requires that pension plans be construed to avoid the forfeiture of vested pension rights. 581 F.2d at 6.

28. This court's evaluation of the reliance interests at stake here is supported by a recent Seventh Circuit decision, *Nachman Corp. v. Pension Benefit Guaranty Corporation,* 592 F.2d 947 (7th Cir. 1979). The pension plan at

issue in that case contained disclaimer language almost identical to that here and had also terminated prior to the minimum vesting standards of Title I. In examining the constitutionality of imposing termination liability under such circumstances, the court discussed the *Allied* decision, comparing the reliance interests in the Minnesota statute to those in ERISA. The court found that the Minnesota statute displaced employer reliance interests far more than Title IV because it imposed liability "for payment of benefits to employees who, since they had not fulfilled service requirements, had no vested rights under the plan." The court also found that Title IV protected employee reliance interests more than the state statute because it was applicable only to vested benefits, where the employee's expectation in retirement security is particularly strong. 592 F.2d at 961–962. As the circuit court noted, the Supreme Court in *Allied* was unwilling to speculate that employees without reliance interests. It is clear, however, that employees do have significant reliance interests in the payment of vested pension benefits.

29. Under limited circumstances, when the shutdown of a facility may signal impending plan

Minnesota law an employer was held responsible for the full pensions of all employees if the plan was determined to be insufficient. By contrast, ERISA tempers the financial impact of termination liability by limiting it to no more than 30% of the employer's statutory net worth and authorizing equitable deferred payment arrangements. 29 U.S.C. §§ 1362(b)(2), 1367. Moreover, during the first nine months after ERISA was enacted, a period applicable to the termination of the Avon plan, the PBGC had the authority to reduce employer liability or waive it altogether in the case of unreasonable hardship. 29 U.S.C. § 1304(f)(4).

This court finds that the termination liability provisions of ERISA upset settled contractual expectations only to a minimal degree. This limited impairment, when balanced against a statutory purpose of protecting against unwarranted and unjust employee deprivation, contrasts sharply with the underlying circumstances in *Allied.*

Defendants' final constitutional claim is that the liability imposed by ERISA is in the nature of a tax or penalty. This contention fails in light of the enunciated purposes of ERISA, which show it to be entirely remedial in nature. *See* 29 U.S.C. § 1001.

■ For the reasons stated above, this court holds that the termination liability provisions of ERISA meet the Fifth Amendment's requirement of due process.

## VI.

Defendants assert that even if they are collectively liable as a controlled group under ERISA, the PBGC should have waived liability under 29 U.S.C. § 1304(f)(4). That section gave the agency discretion to waive or reduce employer liability for a plan which terminated within the first 270 days

termination, an employer may be required to post limited security. That security is refunded if the plan does not terminate in five years, and it may be waived in appropriate situations. 29 U.S.C. §§ 1362(e), 1363.

**30.** 29 U.S.C. § 1304(f)(4) provides:

In addition to its other powers under this subchapter, for only the first 270 days after September 2, 1974 the [PBGC] may—

after enactment of the statute, provided the agency determined that the employer was not able to continue the plan and that an assessment of liability would result in unreasonable hardship.[30]

PBGC maintains that the Ouimet group is not eligible for a waiver or reduction of liability under section 1304(f)(4) because it did not request a waiver within the statutory period, although it did notify the agency that the plan would be terminated within that period. Such notification is required. 29 U.S.C. § 1341.

■ Defendants are correct in observing that the Act does not require an employer to make a formal request for a waiver. They are incorrect, however, in interpreting section 1304(f)(4) to require the agency to issue a waiver merely because it received a notification of termination within the statutory period. The Act specifically grants the PBGC discretion to determine whether liability will be waived.

PBGC's position is that it received many notices of pending plan terminations within the first 270 days after enactment of ERISA. Given the relatively short amount of time available to assess the financial conditions of terminating employers, PBGC relied upon the employers themselves to assess their economic situations and request waivers if needed. PBGC then deployed its limited resources to investigate whether the companies requesting waivers met the statutory conditions. Under the circumstances, such an approach cannot be said to have been unreasonable.

■ Defendants seek to have this issue remanded to the agency for a determination on the merits of their right to a waiver. Regardless of the equities of such an approach, this court has no power to do so. ERISA empowers the PBGC to absolve em-

(4) waive the application of the provisions of sections 1362, 1363 and 1364 of this title to, or reduce the liability imposed under such sections on, any employer with respect to a plan terminating during that 270 day period if the corporation determines that such waiver or reduction is necessary to avoid unreasonable hardship in any case in which the employer was not able, as a practical matter, to continue the plan.

ployers of liability "for *only* the first 270 days" after enactment. 29 U.S.C. § 1304(f) (emphasis added). The time during which the agency had the authority to exercise its discretion has long since passed.[31]

## CONCLUSION

For the reasons stated above, this court ORDERS that PBGC's motions for partial summary judgment and for relief from the automatic stay in bankruptcy are hereby granted. It is further ORDERED that this case is remanded to the Bankruptcy Court for a determination of the net worth of the defendant controlled group, as it has been defined in this opinion.

An order will issue.

---

**31.** Assuming *arguendo* that the agency still had authority to consider defendants' need for a waiver, it is doubtful this court could review the agency's decision not to entertain the claim under the Administrative Procedure Act, since the decision is one committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). *But see* 29 U.S.C. § 1303(f).

In this connection it is also worth noting that, in light of this court's holding, the PBGC, even if it had continuing authority to waive or reduce liability, might well refuse a waiver on the ground that the controlled group, including as it does solvent employers, has the ability to either continue the plan, or reimburse PBGC without undue hardship.