A–T–O, INC., Plaintiff–Appellee,

v.

PENSION BENEFIT GUARANTY CORPORATION, Defendant–Appellant.

No. 78–3269.

United States Court of Appeals,
Sixth Circuit.

Argued June 10, 1980.

Decided Nov. 12, 1980.

**1014**

Henry Rose, Mitchell Strickler, Pension Benefit Guaranty Corp., James N. Dulcan, E. Calvin Golumbic, Wm. F. Hanrahan, Christine C. Nettesheim, Washington, D.C., William S. Kloepfer, U.S. Dept. of Labor, Cleveland, Ohio, for defendant–appellant.

William T. Smith, Calfee, Halter & Griswold, Cleveland, Ohio, for plaintiff–appellee.

Before MERRITT, BROWN and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

On November 30, 1974, almost two months after the enactment of the Employee Retirement Income Security Act (ERISA),[1] A–T–O, Inc. terminated the pension plan for its division, the Springfield Metallic Casket Co., Inc. A–T–O commenced this declaratory judgment action in an attempt to avoid liability to the Pension Benefit Guaranty Corporation (PBGC) according to Title IV of ERISA, § 1301 *et seq.*, for the unfunded, vested pension benefits which the PBGC must pay to the Springfield employees. After both parties filed motions for summary judgment, the district court granted summary judgment for A–T–O. We reverse.

I.

Three primary issues have been raised on appeal: 1) are the unfunded pension benefits "nonforfeitable" within the meaning of § 1322(a); 2) would the payment of the unfunded liability by A–T–O to the PBGC cause an "unreasonable hardship" to A–T–O within the meaning of § 1304(f)(4); and 3) does § 1362 violate the Fifth Amendment on its face or as applied by taking property without due process of law or by retroactively impairing contracts?

A brief overview of the structure of ERISA will aid our later discussion of this case. ERISA, as codified, has three main subchapters. Subchapter I is concerned with the protection of employee pension benefit rights. Its regulatory provisions establish rules for reporting and disclosure, participation and vesting, funding of pension trust, fiduciary responsibility, and administration and enforcement. Subchapter II mainly specifies the jurisdiction of the Secretary of Treasury, Secretary of Labor, and the PBGC. It also provides for the establishment of a Joint Pension Task Force, the undertaking of studies on pension problems, and the qualification of actuaries before the Joint Board for Enrollment of Actuaries. Subchapter III, known as Title IV, creates the PBGC, defines the insurance coverage of pension benefits, delineates the procedures for plan termination, and defines employer liability.

The statutory scheme of Title IV is tightly interwoven. Section 1321 specifies the pension plans which are subject to the termination insurance program, and lists certain exclusions. Section 1322 sets forth the nature and amount of pension benefits guaranteed by the PBGC. In particular, Section 1322(a) provides:

> Subject to the limitations contained in subsection (b) of this section, the corporation shall guarantee the payment of all nonforfeitable benefits (other than benefits becoming nonforfeitable solely on

---

1. 29 U.S.C. § 1001 *et seq.* (1974). ERISA was enacted on September 2, 1974. All statutory citations hereinafter refer to Title 29 of the United States Code unless otherwise indicated.

account of the termination of a plan) under the terms of a plan which terminates at a time when Section 1321 of this title applies to it.

Sections 1306 and 1307 require employers to pay premiums to the PBGC in order to provide funds for the PBGC's payment of guaranteed benefits.

Section 1361 instructs the PBGC to pay the amounts guaranteed under § 1322. Section 1362 provides that employers, which have pension plans covered by the PBGC insurance programs, shall be liable to the PBGC for the insufficiency of their plans' assets at termination, up to a maximum of 30% of the net worth of their corporate assets. Deferred payment schedules for employers are authorized in § 1367. The PBGC is directed in § 1323 to provide insurance to employers against their contingent liability under §§ 1362–64. Section 1381 establishes the effective date of insurance coverage as June 30, 1974, and employer liability as September 2, 1974. However, § 1304(f)(4) allows the PBGC "for only the first 270 days after September 2, 1974" to waive or reduce employer liability on any plan terminating within the 270 day period if the PBGC "determines that such waiver or reduction is necessary to avoid unreasonable hardship in any case in which the employer was not able, as a practical matter, to continue the plan."

In short, if an employer terminates a covered pension plan with insufficient assets to pay the "nonforfeitable" or vested benefits of all the employees, the PBGC pays the amount of the insufficiency to the employees. Then the employer is liable to the PBGC, within certain limitations, for the benefits paid by the PBGC, unless the PBGC grants a waiver.

## II.

The relevant facts are undisputed. From 1884 until November 28, 1974, Springfield Metallic Casket Co. manufactured and sold high quality, expensive copper and bronze caskets. As a result of collective bargaining, Springfield agreed with the United Steelworkers of America, AFL–CIO and its Local No. 1713, which represented the Springfield employees, to establish a pension plan beginning on April 1, 1965.

The pension plan provided originally for monthly retirement benefits of $1.65 for each year of continuous service up to a maximum of 30 years. Employees received full credit for each year of service before 1965. The plan made benefits fully vested for any employee who was age 45 or over and who had 15 or more years of continuous service. Springfield agreed to be solely responsible for funding the pension plan based on a specified contribution for each hour worked. The company and union agreed to amortize over 30 years the liability for past service, which amounted in 1965 to approximately $200,000.[2] The plan stated that the employer's financial obligations would be completely discharged by paying the contributions required by the agreement. The plan provided for the allocation of benefits in the event that the plan had insufficient assets when terminated.

Subsequent contract agreements raised the monthly retirement benefits to $1.85 in 1968, $2.00 in 1969, $2.25 in 1970, and $2.50 in 1971. The amount of required contributions remained unchanged. Consequently, Springfield's contributions to the pension fund did not reduce significantly the unfunded liability to the pension plan.

In October, 1969, A–T–O acquired Springfield as a part of the merger of Mid–Con, Inc. into A–T–O. A–T–O assumed Springfield's obligations under the pension plan and consistently contributed to the plan at the maximum rate deductible under the Internal Revenue Code. Consequently, its contributions from 1970 to 1974 exceeded the amount required by the plan agreement.

In early 1973, A–T–O began to scrutinize closely the unprofitability of the Springfield

---

**2.** The maturity of the Springfield labor force caused the large initial past service liability. On March 31, 1966, the average employee was 48 and had over 13 years of service with Springfield. App. 4.

operations.[3] Saddled with an antiquated plant, which could be modernized only by an infusion of capital equaling or exceeding the asset value of the plant, A–T–O confronted the problems of high costs and a dwindling market for its caskets. Later in 1973, the Occupational Safety and Health Administration cited the Springfield plant with many safety violations and A–T–O feared that OSHA or the Environmental Protection Agency would find other violations for air and water pollution that would require considerable expense to remedy.

At first, A–T–O tried to save the Springfield plant by making changes in the management and some of its operations. By early 1974, however, A–T–O decided to sell or close the plant. During 1974, numerous prospective buyers were contacted. On August 8, 1974, with no firm deal in sight, A–T–O decided to close the plant. An action plan for the shutdown was completed on October 1, 1974. The actual closing occurred on November 28, 1974 and the pension plan was terminated two days later. At termination, the pension plan had assets of approximately $117,000 and an unfunded liability, as estimated by A–T–O, of approximately $193,000.[4]

A–T–O filed its notice of pension plan termination with the PBGC on February 28, 1975. On May 30, 1975, A–T–O filed a petition with the PBGC seeking a § 1304(f)(4) waiver of its potential liability under § 1362 to the PBGC. A–T–O's lengthy and comprehensive petition argued that the imposition of liability to the PBGC would be an "unreasonable hardship," because: 1) the plan was terminated for legitimate business reasons; 2) the decision to close the plant was made before the enactment of ERISA and the closing was prolonged first in an attempt to save the plant and then because of the time necessary to accomplish the shutdown; ·3) A–T–O always contributed to the plan in excess of the required amount; and 4) the plan

agreement absolves A–T–O of any liability above the amount of required contributions. The financial data accompanying the petition supported A–T–O's assertion of the unprofitability of the Springfield plant.

On June 6, 1975, pursuant to the PBGC's request, A–T–O submitted copies of its Form 10–K and Form 10–Q filed in 1974 with the Securities and Exchange Commission. These forms show that A–T–O is a profitable multinational conglomerate engaged in many different areas of manufacturing. Its net income was approximately $7,499,000 in 1970; $7,634,000 in 1971; $8,820,000 in 1972; $10,177,000 in 1973; and $11,193,000 in 1974. Its total sales were $356,288,000 in 1970 and grew to over $475,000,000 in 1974. Its total assets in 1974 were approximately $309,462,000. Earnings per share of common stock increased from $1.25 in 1973 to $1.45 in 1974.

On August 22, 1975, A–T–O filed a supplemental statement with the PBGC in support of its petition for waiver of liability. First, A–T–O argued that the imposition of any liability was unreasonable regardless of the amount, because it would require contributions above the limitations set in the collectively bargained agreement and would penalize A–T·-O for delaying the termination of the plan in an effort to rehabilitate or sell the plant. Second, A–T–O contended that the amount of liability should be determined by looking at the assets of Springfield only and not the assets of A–T–O. It argued that Springfield operated as a totally separate unit within A–T–O and it would be unfair to burden the other divisions with Springfield's liabilities. A–T–O then reported that it realized $863,000 from the sale of Springfield's assets out of total invested capital of approximately $1,660,000. If employer liability of $182,000 were imposed, A–T–O would realize 41% of its invested capital and $102,000 more than the amount of capital which it invested in Springfield from January 1, 1972 to June 30, 1974. App. 236.

**3.** Springfield lost $70,000,000 in 1971 and $231,000,000 in 1972. The projected loss in 1973 was $161,000,000.

**4.** PBGC has not made a final determination of, the amount which it must pay to the Springfield employees because of the insufficient funds in the pension trust fund.

On May 19, 1976, the PBGC informed A–T–O that the petition for waiver of liability was denied.[5] The decision letter declared:

> We recognize that the decision to close Springfield was for a legitimate business purpose, i. e., to avoid continuing losses, and that imposing employer liability on A–T–O will add to those losses. But we believe that these circumstances do not make a waiver necessary to avoid the "unreasonable hardship" which Congress contemplated in Section 4004(f)(4), since the circumstances you describe are not unusual upon termination of a plan. We believe that for the hardship to be "unreasonable" something more must be shown. For instance, we have granted a waiver where the employer demonstrated that he would be unable to continue in business due to imposition of employer liability.
>
> Accordingly, we have decided not to waive employer liability in this case.

App. 251.

Three internal memoranda by PBGC personnel had preceded the decision to deny A–T–O's petition. The first memorandum from the Assistant Director of the Division of Plan Terminations to the General Counsel reported that the unfunded liability was approximately $119,000. Comparing this amount to A–T–O's after–tax profits in 1974 of over $11,000,000, the Assistant Director concluded that A–T–O was able to pay its liability to the PBGC. However, the Assistant Director requested advice from the General Counsel on the definition of the statutory term "unreasonable hardship."

The Deputy General Counsel responded to the Assistant Director of the Division of Plan Terminations on March 30, 1976. Referring to a staff memorandum of March 23, 1976, he recommended that the petition be denied because A–T–O had not shown economic hardship. In the staff memorandum to the Deputy General Counsel, after restating A–T–O's arguments for waiver of liability, the staff attorney wrote:

Nowhere in the petition, or the file, including the Case Officer's recommendation, are there advanced any facts showing why imposition of employer liability in this case would be unreasonable hardship on the operations of A–T–O.

DPT presumably sought our assistance in this matter for a definition of unreasonable hardship. However, the facts of the case do less than give us an indication of what is or what is not unreasonable hardship than they make clear the legitimacy of A–T–O's terminating the Springfield plan. If the matter could be viewed as the "hardship" of forcing A–T–O to reduce further its realization of $863,000 in Springfield's assets in the amount of the unfunded liability. ($193,169 or $119,000, as determined by OPPD), the information supplied by A–T–O does not elucidate the basis on which this further diminution of the amount realized by A–T–O on Springfield would constitute a hardship. Clearly, the merit of the petition is the fact, not persuasive to Congress in adopting an expansive concept of "single employer" in § 4001(b), that a conglomerate may be saddled with pension liabilities of separate operating divisions, irrespective of the management and fiscal integrity of the conglomerate, including the infusion of substantial capital into a failing division. The fact of plan coverage in this instance is also due to the unfortunate lengthy closing procedure, even though the decision to terminate was made prior to enactment.

As attractive as the equities are in terms of A–T–O's responsibility and lack of culpability for any underfunding, I conclude that the petition should be denied on the ground that no economic hardship to the single employer A–T–O has been shown. At best A–T–O has demonstrated that the corporation will realize less on the Springfield liquidation if employer liability is imposed.

---

5. On May 30, 1975, the Board of Directors of the PBGC had waived liability subject to confirmation that liability would cause unreasonable hardship and that the plan could not be continued as a practical matter.

Should we deny the petition for waiver on the foregoing grounds, we need not define what constitutes an unreasonable hardship. If you concur in the recommended disposition, I will prepare an appropriate covering letter.

App. 243–44. This administrative record makes clear that PBGC denied A–T–O's petition for lack of economic hardship and that it did not consider the equitable factors argued by A–T–O.

On June 18, 1976, A–T–O filed its complaint for declaratory judgment. The complaint, as amended, alleged three grounds for reversal of the PBGC's denial of the petition for waiver of liability. First, A–T–O alleged that its plan was exempt from Title IV of ERISA as an individual account plan pursuant to § 1321(b)(1). Second, A–T–O alleged that the PBGC's decision was arbitrary and capricious in its application of § 1304(f)(4) and that its decisionmaking process violated procedural due process. A–T–O charged that § 1304(f)(4) was vague; PBGC had not promulgated any regulation defining "unreasonable hardship" or any procedures for the determination of the waiver; and the Executive Director of the PBGC, who announced the final decision, had a conflict of interest, in that he also was responsible for administering the funding of the PBGC. Third, A–T–O claimed that § 1362 was unconstitutional on its face and as applied for causing the retroactive impairment of contracts and for taking property without due process of law.[6]

Since the facts were undisputed, both parties moved for summary judgment.[7] The district court granted summary judgment for A–T–O.[8] It held, first, that the A–T–O plan is within the coverage of § 1321(a) and is not exempt as an individual account plan pursuant to § 1321(b)(1).[9]

Next, it held that the pension benefits over and above the plan assets at termination were not "nonforfeitable" as defined by § 1002(19), since the payment of these benefits was conditioned on a sufficiency of assets in the pension fund and since the pension plan provided that A–T–O was liable only for the amount of contributions required by the plan. Therefore, it ruled that the unfunded benefits were not guaranteed by the PBGC under § 1322(a), and that A–T–O had no liability under § 1362(b)(1). Finally the district court held that the PBGC's denial of the waiver petition was not "in accordance with law," 5 U.S.C. § 706(a)(A), because the PBGC had incorrectly defined "unreasonable hardship" in § 1304(f)(4) as "economic hardship" only. The district court defined "unreasonable hardship" to mean "an inordinate financial burden, or an inequitable privation." It then ruled that the PBGC's determination was arbitrary and capricious because the PBGC had not considered the equities of the situation in deciding to impose liability on A–T–O. The district court did not address any of A–T–O's constitutional arguments, since it granted A–T–O relief on statutory grounds.

### III.

Since the district court's opinion, the United States Supreme Court has decided the hotly contested definition of "nonforfeitable benefits" in § 1322(a). *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). In *Nachman Corp.*, the Supreme Court held that "otherwise defined, vested benefits", 446 U.S. at 362, 100 S.Ct. at 1726, were "nonforfeitable" within the meaning of § 1322(a), even though certain plan provisions limited the benefits to the amount of assets in the pension fund.

**6.** A–T–O's other constitutional allegations based on Article I were not argued on appeal. A discussion of these allegations is not necessary and would not change our decision.

**7.** PBGC's motion to dismiss was treated as a motion for summary judgment after the district court permitted discovery on the decision–making process followed by the PBGC on A–T–O's petition.

**8.** The district court's opinion is reported at 456 F.Supp. 545.

**9.** A–T–O did not appeal this finding. It is plainly correct.

The plan provisions were called "employer liability disclaimer clauses," which did not condition the rights or claims of employees to the amount of benefits defined in other provisions of the plan. 446 U.S. at 369, 100 S.Ct. at 1730. The Supreme Court rejected the argument that the definition of "nonforfeitable benefits" depended on the meaning of "nonforfeitable" in § 1002(19) as used to define the vesting requirements in Title I of ERISA. 446 U.S. at 370, 100 S.Ct. at 1730.

The similarity of the pension plan provisions in *Nachman Corp.* and our case is striking. The pension plan in *Nachman Corp.* provided, in pertinent part:

> Benefits provided for herein shall be only such benefits as can be provided by the assets of the Fund. In the event of termination of th[e] Plan, there shall be no liability or obligation on the part of the company to make any further contribution to the Trustee except such contributions, if any, as on the effective date of such termination, may then be accrued but unpaid.

The A–T–O pension plan, in pertinent part at § 10.4 reads:

> Payments made in accordance with this Section 10 shall be in complete discharge of the Company's financial obligation under this Agreement. The Pension benefits of this Agreement shall be only such as can be provided by the assets of the Pension Trust and there shall be no further liability or obligation on the Company to make any further contributions to the Pension Trust for any reasons.

Both plans then proceeded to allocate the assets of the plan in the event of termination with insufficient funds to pay all vested benefits. The Springfield plan was more specific in this respect.

■ There is no meaningful distinction between the A–T–O pension plan and the Nachman pension plan. The Supreme Court's holding and reasoning in *Nachman Corp.* is directly applicable. Therefore, we reverse the district court and hold that the benefits provided in the A–T–O pension plan are "nonforfeitable" within the meaning of § 1322(a), and, consequently, that PBGC has a right according to § 1362 to recover from A–T–O any benefits which it must pay to A–T–O (Springfield) employees under § 1361.

## IV.

Pursuant to § 1304(f)(4), the PBGC has authority "for only the first 270 days after September 2, 1974" to

> "waive the application of the provisions of sections 1362, 1363, and 1364 of this title to ... any employer with respect to a plan terminating during that 270 day period if the corporation determines that such waiver ... is necessary to avoid unreasonable, hardship in any case in which the employer was not able, as a practical matter, to continue the plan."

Upon review of the PBGC's denial of A–T–O's petition for a waiver of liability under § 1362, the district court held that the PBGC erred in not considering equitable factors, such as the reason for the termination, the time of the decision to terminate, the reason for the unfunded liability in the pension trust, the efforts of A–T–O to fund the pension plan and to keep the plant open, and the reliance of A–T–O on the contractual limitations of liability, to which the union agreed.[10] Its *only* reasoning for this

---

**10.** The PBGC's final decision to deny the petition for waiver is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* We do not agree with the dictum in *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 959 n.31 (D. Mass. 1979) that this decision is committed to the PBGC's sole discretion by law. 5 U.S.C. § 701(a)(2). This exception to judicial review is "very narrow" and "is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), *quoting,* S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945). Judicial review is granted in 29 U.S.C. § 1303(f) to "any participant, beneficiary, plan administrator or employee adversely affected by *any action* by the corporation." (Emphasis added). The interpretation and application of "unreasonable hardship" in § 1304(f)(4) is a task to which the judiciary is well accustomed and well suited.

interpretation of § 1304(f)(4) appeared in footnote 20 of its opinion:

> Had Congress intended the employer's net worth to be the sole determining factor of "unreasonable hardship," it would have so provided as it did in section 1362(b)(2) where it set a ceiling upon employer liability.

■ The dispute between the PBGC and A–T–O is relatively narrow. Both parties agree that A–T–O is financially able to pay the amount to which it may be liable to the PBGC.[11] It is uncontested that A–T–O "was not able, as a practical matter to continue the [pension] plan" at Springfield. The parties take issue on one question of law: the meaning of "unreasonable hardship." Because we hold that the PBGC correctly limited its consideration of A–T–O's petition to the economic hardship which employer liability under § 1362 would impose on A–T–O, we reverse the district court.

### A.

The PBGC has interpreted § 1304(f) to apply only to substantial economic hardship. Its interpretation is entitled to deference. *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 730 (9th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

The construction of "unreasonable hardship" in § 1304(f)(4) presents a novel issue. No judicial decision offers guidance nor is the legislative history discussing this particular section helpful. To determine the meaning of "unreasonable hardship," we must consider the structure of the statute itself and the legislative history of ERISA.

Congress stated the purposes of Title IV of ERISA when establishing the PBGC. These purposes are:

> (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,

> (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and

> (3) to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. § 1302(a). The first purpose is not applicable in our case of a plant closing because of unprofitability. Deterring employer abuse of the termination insurance program is also not a concern in our case. The second and third purposes shed some light on our problem by indicating that pension benefits are to be fully protected and that the cost of insurance to employers should be kept low. Both purposes are served by an adequately funded PBGC. Employer liability is an important means of funding the PBGC directly for some, if not all, of its payments to employees. However, the statement of purposes is not very helpful in resolving the specific issue before us.

Similarly, the Congressional findings on the need for ERISA state, in part, that "owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits." 29 U.S.C. § 1001(a). In response to this perceived harm to interstate commerce and "the interests of participants in private pension plans," Congress declared the policy of ERISA to be the "improving [of] the equitable character and the soundness of such plans . . . by requiring plan termination insurance." 29 U.S.C. § 1001(c). Therefore, the provisions of ERISA should be interpreted, if possible, so as to protect employees' expectations in their vested pension benefits. Since the scope of the PBGC's guarantee of benefits (§ 1322) and liability

---

**11.** The ability to pay the employer liability to the PBGC must be measured against the financial condition of A–T–O, not Springfield. 29 U.S.C. § 1301. *See also Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. at 948–54. A–T–O has not argued to the contrary before the district court or on appeal, though it did argue to the PBGC that only the assets of Springfield should be utilized in determining the economic hardship from employer liability. App. 231, 234–37.

to employees (§ 1361) is substantially congruent with the employers' liability to the PBGC (§ 1362), normally the provision for employer liability should be read liberally. Again, this general rule of interpretation is only useful in construing § 1304(f)(4) to the extent that the termination insurance program was "intended to be self–financing." 120 Cong.Rec.S. 29954 (August 22, 1974) (Sen. Gaylord Nelson). *See also* H.R.Conf. Rep.No.93–1280, 93rd Cong., 2d Sess., *reprinted* in [1974] U.S.Code Cong. & Ad. News, pp. 4639, 5038, 5143. The liability of employers to the PBGC is an important, but not exclusive source of funding.[12]

Though Congress was concerned chiefly with protecting the employees' expectations of pension benefits, it also realized that employers would not create, maintain, or expand pension plans if ERISA imposed too much cost. Consequently, the entire statute is a finely tuned balance between protecting pension benefits for employees while limiting the cost to employers. S.Rep.No.94–383, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News, pp. 4890, 4904 (Senate Finance Committee); 120 Cong.Rec.H. 8702, *reprinted in* [1974] U.S.Code Cong. & Ad. News, pp. 5166, 5167 (Rep. Al Ullman). At times, Congress determined precisely the proper balance, such as setting a ceiling on the employer's liability at 30% of its net worth, § 1362(b)(2); limiting the amount of benefits which the PBGC may guarantee, § 1322(b)(3); phasing in the amount of benefits to be guaranteed from plan amendments, § 1322(b)(8); authorizing the PBGC to offer insurance to employers against their contingent liability, § 1323(a); providing for low insurance premium rates, § 1306; and establishing the effective dates of the statutory provisions. In other sections of ERISA, Congress granted the PBGC or another administrator discretion to waive or defer obligations owed by employers in order to ameliorate hardship to them. For example, an employer may petition for variances on the funding and vesting requirements, §§ 1057, 1083; equitable terms for the payment of employer liability, § 1367; an extension of the amortization period, § 1084; and a waiver of the penalty for late payment of insurance premiums, § 1307(b).

In every instance, the statutory language and the legislative history show a concern only for *economic hardship* to the employer, when the employer's interests were considered. A more detailed examination of several sections of ERISA, by way of example will serve to support this conclusion.

Congress limited employer liability to the PBGC to 30% of the employer's net worth. Like many sections of ERISA, the ceiling was a product of compromise within the conference committee. The House and Senate bills set the ceiling at 50% of net worth. H.R.Conf.Rep.No.93–1280 [1974] U.S.Code Cong. & Ad. News at p. 5155. Congress enacted a ceiling to avoid discouraging the creation or liberalization of pension plans and especially, as the conference committee's reduction of the ceiling indicates, to prevent substantial economic hardship to employers. H.R.Rep.No.93–533, 93rd Cong., 1st Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News pp. 4639, 4654 (Education and Labor Committee); S.Rep.No.93–127, 93d Cong., 1st Sess., *reprinted in* [1974] U.S. Code Cong. & Ad. News pp. 4338, 4862 (Labor and Public Welfare Committee): S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at p. 4971.

Congress granted broad discretion to the PBGC to arrange equitable terms for the payment of the employer liability. The language of § 1367, which provides for "equitable and appropriate" terms, would appear to include factors other than economic hardship. However, in explaining the purpose of § 1367, the Senate Finance Committee declared:

> The Corporation is authorized to make arrangements with employers for payment of their liabilities under this provi-

---

**12.** The PBGC was authorized to borrow $100,-000,000 from the Treasury to cover initial pay-

ments of benefits. 29 U.S.C. § 1305(c).

sion, including arrangements for deferred payment on such terms and for such periods as the Corporation concludes are equitable and appropriate. In making its determinations, the Corporation is to give due regard to hardships that may result to the employer and to the employer's shareholders. However, the Corporation is to apply these rules in such a way as to not defeat the purpose for imposing this contingent liability—deterrence of unrealistic promises and of abuse of the insurance system.

S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at p. 4972. Thus, the only relevant equitable factor with respect to the employer in this section is the employer's ability to pay.

Congress used its most specific language in providing for a waiver of the minimum funding standards in the event of "substantial business hardship." 29 U.S.C. § 1083(a). Some of the factors to be considered in determining substantial business hardship were explicitly declared:

(1) the employer is operating at an economic loss,

(2) there is substantial unemployment or underemployment in the trade or business and in the industry concerned,

(3) the sales and profits of the industry concerned are depressed or declining, and

(4) it is reasonable to expect that the plan will be continued only if the waiver is granted.

29 U.S.C. § 1083(b). The legislative history makes clear that a waiver ordinarily should not be granted when the financial hardship was the employer's own creation. H.R.Rep. No.93–533 [1974] U.S.Code Cong. & Ad. News at p. 4747; S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at p. 4946. Though it could be argued that the stark contrast of the specificity of "substantial business hardship" in § 1083 with the imprecision of "unreasonable hardship" in § 1304(f)(4) suggests that § 1304(f)(4) allows consideration of equitable factors other than economic hardship, the more persuasive conclusion, in light of the explicit, numerous references to financial hardship,

is that Congress enacted these waiver provisions to mitigate financial hardship to employers and thereby to lessen the inducement to terminate or curtail pension benefits.

The House and Senate bills provided a delayed effective date for Title IV and employer liability. The delayed effective date was proposed in order to allow the PBGC time in which to prepare the termination insurance program, to build up a fund, and to gain helpful experience for setting the premium rates. S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at pp. 4912, 4967. The conference committee however, decided to provide insurance coverage for pension benefits as of June 30, 1974 and employer liability effective the date of enactment on September 2, 1974, and to authorize the PBGC to borrow $100,000,000 from the federal treasury. As explained by Senator Javits, the expedited effective date was a product of careful consideration:

As indicated previously, Senate provisions predominate in the conference agreement on plan termination insurance. Probably one of the most difficult problems confronted by the conferees was the selection of effective dates for the insurance program, and here both Senate and House conferees worked diligently to arrange a structure of effective dates that would bring the insurance protection generally into effect as quickly as possible. This was done in recognition of the fact that depressed economic conditions in certain regions created the possibility that a *number of plans were in critical straits and were terminating or were likely to do so imminently.* Lack of immediate protection for beneficiaries in these cases involved workers who had earned or were drawing pensions notwithstanding the new provisions of the bill which have a delayed effective date.

120 Cong.Rec.S. 29940 (August 22, 1974) (emphasis added). This statement discloses that the effective date was advanced in order to protect as quickly as possible employees' pension benefits. The difference in effective dates between the PBGC coverage

of pension benefits and employer liability shows that Congress acted with precision in setting the effective date for employer liability. To prevent employer abuse of the termination insurance program, the effective date for employer liability was also pushed forward. Borrowed money would provide the PBGC with the funds to pay pension benefits, and employer liability would allow the PBGC to recover the sums paid so that it could become self–financing. H.R.Conf.Rep.No.93–1280 [1974] U.S.Code Cong. & Ad. News at p. 5143.

An examination of the legislative history leads to two conclusions. First, Congress considered many of the "equitable" factors cited by the district court and A–T–O for granting the waiver. The statutory provisions, such as the expeditious effective date for Title IV, reflect the balance of equities as determined by Congress. In Congress' view, the balance tipped in favor of protecting employees' benefits, and, concomitantly, therefore, in favor of employer liability to protect and to finance the PBGC's fund.

Second, Congress built into the statute many safeguards for employers. These safeguards were aimed at preventing undue financial hardship that would threaten the solvency of a business or would cause a business to curtail or terminate its pension plan. The many grants of discretionary authority to the Secretary of the Treasury, Internal Revenue Service, or the PBGC were uniformly directed at mitigating the economic impact of ERISA.

The inclusion of the net worth limitation on employer liability does not indicate that Congress intended § 1304(f)(4) to include equitable factors other than financial conditions. Section 1304(f)(4) was added when the conference committee pushed forward the effective date for Title IV. The percentage of net worth limitation, which had been in earlier versions of the statute, was reduced by the conference committee. This history suggests the concern of Congress that the undelayed effective date of Title IV, including employer liability, could impose unexpected, serious economic hardship on some employers that the net worth limi-

tation could not adequately relieve. Financial hardship could result, even through the employer liability was less than 30% of net worth, for example, if the company faced severe cash flow constraints, or in some circumstances if the company would be restricted in offering securities or in obtaining a loan. Since Congress could not foresee all of the possible situations of employer hardship, it granted discretion to the administrative agencies. But by setting the effective date of Title IV at the date of enactment, Congress determined the equity of making employers immediately subject to liability under § 1362.

In sum, we hold that a waiver for "unreasonable hardship" in § 1304(f)(4) should be granted only if the employer can demonstrate unreasonable economic harm. Therefore, we reverse the district court's ruling that the PBGC's denial of A–T–O's petition was not in accordance with law and was an abuse of discretion.

### B.

A–T–O has argued before the district court and on appeal that the lack of procedures, regulations and guidelines accompanying the PBGC's determination of its petition for waiver constitutes a denial of procedural due process or a violation of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. However, A–T–O does not and cannot contest the facts in the administrative record, which are drawn from its own submissions. A–T–O challenges only the PBGC's interpretation of "unreasonable hardship" in § 1304(f)(4). This interpretation is a question of law, which the PBGC decided correctly in its May 19, 1976 letter to A–T–O.

A–T–O had a full opportunity through its written submissions to argue its construction of § 1304(f)(4). The waiver petition did not call for, or require, rulemaking procedures, since the PBGC's decision on A–T–O's entitlement to a waiver was determining the obligations of A–T–O and was not an agency statement directed to the "future effect" of § 1304(f)(4). 5 U.S.C. § 551(4). See, PBW Stock Exchange, Inc. v. Securi-

ties and Exchange Comm'n, 485 F.2d 718, 732 (3d Cir. 1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974). Nor does § 1304(f)(4) require a formal adjudication of A–T–O's petition. 5 U.S.C. § 554(a). Moreover, because the facts are undisputed and the written briefs argued the law, an adjudicatory hearing is unnecessary. In view of the limited temporary authority granted to the PBGC in § 1304(f)(4), we are reluctant to require the PBGC to promulgate a regulation defining "unreasonable hardship" before acting on the petitions for waiver of employer liability. Even if the application of the "unreasonable hardship" standard could be uncertain in some marginal cases, the undisputed facts show clearly that A–T–O cannot benefit from § 1304(f)(4). In our opinion, the PBGC afforded A–T–O a full and fair consideration of the petition, interpreted § 1304(f)(4) in accordance with Congressional intent, and did not abuse its discretion in deciding to deny the petition.

### V.

■ Because we have held that A–T–O is liable to the PBGC according to § 1362 and that the PBGC did not abuse its discretion or contravene procedural requirements in denying A–T–O's petition for waiver of liability, we must address the constitutionality of § 1362 on its face and as applied. The constitutional attack on § 1362 also includes § 1322.

A–T–O contends that employer liability violates the due process clause of the Fifth Amendment, which prohibits the taking of property without due process. A–T–O also argues that § 1362 violates the Fifth Amendment by retroactively impairing the pension plan agreement between it and the union. As the contract clause of Article I, § 10 of the Constitution applies only to state legislation, this latter argument has force only to the extent that the contract clause principles may be incorporated into the Fifth Amendment. See Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947, 959 (7th Cir. 1979), aff'd on other grounds, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

In Nachman Corp., the Seventh Circuit ruled that the due process clause did not forbid the employer's retroactive liability under ERISA for the payment of unfunded, vested pension benefits. The Supreme Court granted certiorari limited to the statutory question of the proper construction of "nonforfeitable benefits" in § 1322(a), though the petition for certiorari sought review of the constitutional issue. 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 309 (1979). The Supreme Court's opinion quoted at some length the Seventh Circuit's reasoning on the constitutional question, 446 U.S. at 367, 100 S.Ct. at 1729, but did not itself address this question. Nonetheless, we doubt that the Supreme Court would have affirmed the Seventh Circuit's interpretation of employer liability under ERISA, if it believed the statutory provision for employer liability to be unconstitutional on its face or as applied. Furthermore, the majority reached its interpretation of "nonforfeitable benefits," despite the admonition to construe the statute in a manner which would avoid raising constitutional problems. 446 U.S. at 368, 100 S.Ct. at 1730.

The persuasive and thorough discussion of the constitutional issues by the Seventh Circuit in Nachman Corp., and by Judge Joseph L. Tauro in Pension Benefit Guaranty Corp. v. Ouimet Corp., 470 F.Supp. 945, 954–58 (D.Mass.1979), permits us to focus our attention mainly on the constitutionality of § 1362 as applied to A–T–O.

Our inquiry is whether or not § 1362 is a rational means for achieving legitimate ends. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); Nachman Corp., 592 F.2d 958. A–T–O contends that Title IV of ERISA goes too far in disturbing its reliance on the negotiated pension plan agreement, that the retroactive effect is substantial, and the legitimate purposes of ERISA are not served by imposing liability on it. A–T–O relies on Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), which held the Railroad Retirement Act unconstitutional,

and *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), which declared the Minnesota Private Pension Benefits Protection Act contrary to the contract clause of Article I, § 8.

The PBGC, on the other hand, argues that employer liability is an integral part of the termination insurance program, that liability in this case fosters Title IV's purposes, that Title IV is carefully designed to minimize the retroactive impact on employers, and that Congress found the employees' reliance interest to outweigh the employers' expectations in light of the important social problem demanding redress. The PBGC rests its argument on *Usery v. Turner Elkhorn Mining Co., supra,* which upheld employers' retroactive payments of black lung benefits.

Congress enacted ERISA after years of investigation into the substantial harm suffered by employees who lost, for various reasons, their retirement benefits. The widespread and serious nature of the problem is stated expressly in the findings of fact and declaration of policy. 29 U.S.C. § 1001. The legislative history is replete with descriptions of the economic plight of workers who were deprived of their pensions, after long years of labor in expectation of a comfortable retirement, because of plant terminations, improper fund management, stringent vesting requirements, or lax funding. H.R.Rep.No.93–533 [1974] U.S.Code Cong. & Ad. News at p. 4680; S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at pp. 4902, 4962; 120 Cong. Rec.S. 29934, 29952 (remarks of Sen. Javits and Nelson). The grim statistics demonstrate the compelling national problem confronted by Congress. H.R.Rep.No.93–533 [1974] U.S.Code Cong. & Ad. News at p. 4680; S.Rep.No.93–127 [1974] U.S.Code Cong. & Ad. News at p. 4847; S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at pp. 4902, 4963. The proven scope of the problem and the broad relief granted by Congress amply distinguishes the Minnesota

Private Pension Benefits Protection Act which the Supreme Court held to violate the contract clause in *Allied Structural Steel Co. v. Spannaus,* 438 U.S. at 236, 98 S.Ct. at 2718 (1978).

The purposes of Title IV are stated expressly in § 1302(a): 1) to encourage the creation and continuation of private pension plans; 2) to protect employees' pension benefits; and 3) to keep the insurance premiums paid to the PBGC as low as possible. In addition, the legislative history demonstrates the Congressional purpose of imposing employer liability in order to prevent employers from abusing the termination insurance program by shifting their financial burdens under pension plans to the PBGC or by making unrealistic promises to employees. H.R.Conf.Rep.No.93–1280 [1974] U.S.Code Cong. & Ad. News at pp. 5148, 5161; S.Rep.No.93–383 [1974] U.S.Code Cong. & Ad. News at pp. 4911, 4964, 4971; S.Rep.No.93–127 [1974] U.S.Code Cong. & Ad. News at p. 4862; H.R.Rep.No.93–533 [1974] U.S.Code Cong. & Ad. News at p. 4654. It is manifestly clear that the means of employer liability is rationally related to the achievement of these legitimate ends. The uncontested legitimacy of these ends and the rationality of the means distinguish the Supreme Court's reasoning in *Railroad Retirement Board v. Alton Railroad Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935).[13] Holding A–T–O liable to the PBGC advances at least the stated purpose of providing funding for the PBGC to enable it to keep insurance premiums low and to become self–financing.

The termination insurance program in ERISA, like all of its sections, is carefully tailored to fit the specific needs found by Congress at the least possible cost to employers. Our discussion in section III enumerated the many statutory provisions which moderate the employer's liability to the PBGC and which minimize the costs of compliance with ERISA. *See Nachman*

---

**13.** Like the district court in *Ouimet Corp.,* we also question the continued vitality of the Supreme Court's reasoning in *Alton Railroad Co.,* 470 F.Supp. at 955. The constitutionality of

federal legislation producing the largest retirement system in the nation, the Social Security system, has been upheld. *Helvering v. Davis,* 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937).

*Corp.*, 592 F.2d at 962–63; *Ouimet Corp.*, 470 F.Supp. at 957–58. Unlike the Minnesota statute in *Allied Structural Steel Co.*, the employer's reliance interests are minimally disturbed by ERISA because it is liable only for the pension benefits which have vested according to the pension plan. Also, unlike the Minnesota statute, § 1304(f)(4) allowed a grace period for employer liability if the employer showed need.

These provisions have amply protected A–T–O in this case. A–T–O will not suffer any significant harm from its liability to the PBGC. In fact, the liability can be paid from the money realized from the sale of Springfield's assets. App. 236. A–T–O's reliance on the disclaimer clause in the pension agreement is defeated,[14] yet its harm is minor compared to the potential injury to the Springfield employees if their pensions are not paid. Employer liability to the PBGC is one means of funding the PBGC so that it can guarantee pension benefits while also becoming self–financing. Self–financing prevents the PBGC from drawing on the public fisc. Employer liability places the financial obligations on the responsible party. But most important is the determination by Congress that the overriding goal of ERISA and the termination insurance program is to protect employees' pension benefits, even at the expense of employers. *Nachman Corp.*, 592 F.2d at 961–62; H.R. Rep.No.93–533 [1974] U.S.Code Cong. & Ad. News at p. 4654; S.Rep.No.93–127 [1974] U.S.Code Cong. & Ad. News at p. 4862; 120 Cong.Rec.S. 29940 (remarks of Sen. Javits quoted *supra*). As the Seventh Circuit stated succinctly, in distinguishing *Allied Structural Steel Co.* and *Alton Railroad Co.*:

> In this case, then, the question Congress answered was not merely who should provide workers with retirement income, but who should bear the costs of a plan termination: a solvent employer who has received the full benefit he bargained for or the employee with vested benefit rights.

592 F.2d at 962. Put in these terms, the answer was obvious to Congress and "it was reasonable for Congress to conclude that this liability represented 'an actual, measurable cost of . . . [the employer's] business.' " *Id., quoting Turner Elkhorn Mining Co.*, 428 U.S. at 19, 96 S.Ct. at 2894.

Finally, Congress gave careful attention to the retroactivity problem. Despite the arguments of some Congressman that Title IV may be unconstitutional,[15] Congress not only passed Title IV, it also advanced the effective date from that originally proposed in the House and Senate bills. Furthermore, while PBGC coverage of pension benefits was extended back before the enactment date, employer liability was started at the enactment date. Hence, only an act by an employer after the enactment of ERISA could trigger employer liability under § 1362.

In short, Congress investigated very thoroughly the national problems related to private pension plans and then enacted a statute which was skillfully designed to remedy the problems found while minimizing the costs to employers. ERISA represents Congress' best judgment on the precise balance between the interests of employees and employers. Our reading of the statute and the legislative history convinces us, without a shadow of a doubt, that the imposition of employer liability in § 1362 is constitutional on its face and as applied to A–T–O.

## VI.

The PBGC has not reached a final determination of the amount owed by A–T–O.

---

**14.** The strength of A–T–O's reliance interest is considerably dissipated by Ohio law, which holds that the vesting of pension benefits upon performance of the required years of service changes a revocable offer of benefits into a binding and enforceable obligation. *Luli v. Sun Products Corp.*, 60 Ohio St.2d 144, 398 N.E.2d 553 (1979); *Cantor v. Berkshire Life Insurance Co.*, 171 Ohio St. 405, 171 N.E.2d 518, 522

(1960). *See also, Matter of Erie Lackawanna Ry. Co.*, 548 F.2d 621, 625–27 (6th Cir. 1977) (appeal of non–contract retirees); *Ouimet Corp.*, 470 F.Supp. at 956–57.

**15.** H.R.Rep.No.93–533 [1974] U.S.Code Cong. & Ad. News at p. 4666 (Supplemental views of Representatives Quie, Ashbrook, Erlenborn, Eshleman, and Hansen).

Therefore, the district court is instructed to remand this case to the PBGC for such a determination.

The judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.